STRANCH, J., delivered the opinion of the court in which GIBBONS, J., joined. GILMAN, J. (pp. 335-38), delivered a separate dissenting opinion.
OPINION
JANE B. STRANCH, Circuit Judge.
This diversity case involves claims that straddle the line between tort and contract *330 and requires determination of the scope of Kentucky’s economic loss rule. The damages at issue were incurred when an RV refrigerator manufactured by Norcold overheated and caused a fire that destroyed the RV. The district court held that the economic loss rule as adopted in Kentucky does not prohibit State Farm from bringing a tort claim against Norcold. We affirm.
I. BACKGROUND
This case turns on applicability of the economic loss rule to consumer transactions in Kentucky. The economic loss rule prevents a plaintiff from recovering in tort for damage caused by a defective product when the only damages are to the product itself and consequential damages such as lost profits; it requires any recovery for those types of damages to be sought through contract claims. Norcold stipulated that it was responsible for the damage to the RV if the economic loss rule did not apply, then appealed and moved to certify questions about the doctrine’s scope to the Supreme Court of Kentucky.
A. Factual History
The parties stipulated to the facts in this case. Norcold manufactured the refrigerator in question in 2007. That same year, the refrigerator was installed by manufacturer Tiffin into a 2007 Phaeton model recreational vehicle (RV). The refrigerator came with a three-year express limited warranty. The RV was bought by its original purchaser that same year. In 2010, Norcold issued a recall on this model of refrigerator. The recall notice informed owners that they should immediately stop using their refrigerators and have repairs done to add a temperature-monitoring controller to help prevent overheating that could result in a fire. The recall repairs were performed on this RV by a third-party authorized service center in 2011. The RV was still owned by the original purchaser at the time of the recall notice and repair work.
In 2012, Larry Swerdloff purchased the used RV. Swerdloff had no contact with Norcold when he bought the RV, and the three-year warranty had expired by its terms prior to Swerdloffs purchase. Swerdloff insured the RV through State Farm.
In September 2013 a fire caused by the refrigerator destroyed the RV in Pendle-ton County, Kentucky. The fire did not cause any personal injuries, but the RV and its contents were a total loss. State Farm paid $145,193.20 to Swerdloff under the insurance policy. Norcold has stipulated that it owes State Farm $145,193.20 if the economic loss rule does not apply to the consumer transaction in this case.
B. Procedural History
State Farm filed suit, against Norcold in Kentucky state court in 2014. Norcold removed the case to federal court based on diversity jurisdiction. The district court denied Norcold’s motion for partial summary judgment and held that the Supreme Court of Kentucky would not apply the economic loss doctrine to consumer transactions. State Farm Mut. Auto. Ins. Co. v. Norcold, Inc., 89 F.Supp.3d 922, 928 (E.D. Ky. 2015). Norcold moved for interlocutory appeal of that order. The district court ordered briefing on whether the question should be certified to the Supreme Court of Kentucky. Following briefing, the district court denied the motion for interlocutory appeal and declined to certify the question of law to the Kentucky court.
To expedite a final appealable judgment, Norcold stipulated to conditional liability and the amount of damages while reserving the right to appeal the question of whether the economic loss rule should ap *331 ply in this action. State Farm moved for summary judgment, which the district court granted. Norcold appealed the final judgment and moved to certify questions of law to the Supreme Court of Kentucky.
II. ANALYSIS
A. Standard of Review & Applicable Law
We review grants of summary judgment de novo. V & M Star Steel v. Centimark Corp., 678 F.3d 459, 465 (6th Cir. 2012). “Summary judgment is appropriate only when the evidence, taken in the light most favorable to the nonmoving party, establishes that there is no genuine issue as to any material fact and the mov-ant is entitled to judgment as a matter of law.” Id. (citing Fed. R. Civ. P. 56(c)).
As a federal court exercising diversity jurisdiction, the choice-of-law rules of the forum state, Kentucky, determine what substantive law to apply. NILAC Int’l Mktg. Grp. v. Ameritech Servs., Inc., 362 F.3d 354, 358 (6th Cir. 2004). The parties stipulate that Kentucky law applies. There is a reasonable basis for this stipulation, as the damage in this case occurred with a fire in Kentucky and there is a “provincial tendency in Kentucky choice-of-law rules.” Wallace Hardware Co., Inc. v. Abrams, 223 F.3d 382, 391 (6th Cir. 2000).
B. Economic Loss Rule in Kentucky
In Giddings & Lewis, Inc., the Supreme Court of Kentucky adopted the holding of the U.S. Supreme Court that “a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself.” Giddings & Lewis, Inc. v. Indus. Risk Insurers, 348 S.W.3d 729, 738 (Ky. 2011) (quoting East River Steamship Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) (applying admiralty law)). Recognizing that, at the time, “virtually all states applied] the rule in some form,” id. at 736, the Kentucky court adopted the economic loss rule in the commercial context, thus preventing a “purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself.” Id. at 733. It also concluded “that such damages must be recovered, if at all, pursuant to contract law.” Id.
Giddings & Lewis involved a large machine that consisted of a turning lathe, two machining assemblies, and a material handling system. Id. at 734. The machine had been custom made by Giddings & Lewis for the purchaser, Ingersoll Rand, which had provided detailed specifications. Id. The two parties negotiated a written contract that included an express warranty. Id. Seven years after the system was installed and after the warranty had expired, part of the lathe flew off the machine and caused approximately $2,800,000 in damage to the machine. Id. The insurers of Ingersoll Rand brought tort claims against Giddings & Lewis arguing, as pertinent here, that: 1) Kentucky should not adopt the economic loss rule and 2) if it did, a “calamitous event” exception should be recognized. Id. at 735.
Giddings & Lewis traced the history of the economic loss rule in Kentucky beginning with application of the doctrine in a commercial transaction context by the Kentucky Court of Appeals in Falcon Coal Co. v. Clark Equipment Co., 802 S.W.2d 947 (Ky. App. 1990). The Kentucky Supreme Court declined to review that case but expressed skepticism about the doctrine a few years latér by noting in dicta that the Falcon Coal holding was too broad. Real Estate Marketing, Inc. v. Franz, 885 S.W.2d 921, 926 (Ky. 1994) *332 (saying “[w]e do not go so far as the Court of Appeals ... in Falcon Coal, ... limiting recovery under a products liability theory to damage or destruction of property ‘other’ than the product itself.”). The Sixth Circuit interpreted the dicta in Franz as “probably answering] in the negative the question of whether the economic loss doctrine applies to consumer purchases in Kentucky.” Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848-49 (6th Cir. 2002).
Giddings & Lewis acknowledged that the dicta in Franz was “not altogether clear” and suggested either that: 1) there is an exception to the dobtrine for damaging events, or 2) Kentucky would not apply the doctrine to consumer transactions. 348 S.W.3d at 737. The court overruled Franz “[t]o the extent Franz's alluded-to limitation of Falcon Coal can be read to suggest that a commercial purchaser can recover economic losses under a strict liability theory if a destructive event damages the product itself.” Id. at 741. The second possible interpretation — that the economic loss doctrine did not apply to consumer transactions — was not directly addressed by the court. Instead, the court observed in a footnote:
The case sub judice does not require us to consider the effect of the economic loss rule on consumer transactions but, notably, the Restatement (Third) of Torts: Products Liability makes no distinction between products produced for commercial customers and those produced for consumers. See Restatement (Third) of Tort § 19(a) (1998) defining ‘product’ in relevant part as ‘tangible personal property distributed commercially for use or consumption.’
Id. at 737 n.5.
Holding that the economic loss rule applies in the commercial context, the Kentucky Supreme Court then undertook a discussion of the “principles underlying” the rule and its application to the facts presented. Id. at 738.
1. Policies Underlying the Economic Loss Rule
Giddings & Lewis listed the policies supporting the economic loss rule as: 1) maintaining the distinction between tort and contract law; 2) protecting the freedom to contractually allocate economic risk; and 3) encouraging the party best situated to assess the risk of economic loss to insure against that risk. Id. at 739 (quoting Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th Cir. 2002)). We therefore use those policies as the framework for analyzing Norcold’s argument that Kentucky’s economic loss rule extends or should extend to consumer transactions.
a) Preserving the Line Between Tort and Contract Law
The first policy — preserving the line between tort and contract law — can apply in both commercial and consumer settings. Kentucky law, however, has drawn the distinction between tort and contract differently depending on whether a transaction is in a commercial or consumer context. See, e.g., Ky. Rev. Stat. § 367.120 et seq. (Kentucky Consumer Protection Act); Ky. Rev. Stat. § 355.2-102 (exempting statutes regulating sales to consumers from modification by Article II of the UCC).[1]
*333 b) Ability to Allocate Risk via Contract
The second policy — protecting freedom to allocate risk by contract — has different implications in the contexts of commercial and consumer transactions. Parties engaging in commercial transactions are generally sophisticated and have relatively equal bargaining power. Barkley Clark & Christopher Smith, Law of Product Warranties § 1:12 (rev. ed. 2016). Such parties engage in active negotiations that permit meaningful allocation of risk. Consumers, on the other hand, are usually less sophisticated — one cannot specialize in every product one purchases — and bargain with unequal power when negotiations actually do occur. Consumers frequently face adhesion contracts that render the purchase of products a take-it-or-leave-it proposition. In many cases, moreover, consumers are unaware of the risks inherent in a product, let alone the opportunity to allocate that risk by contract.
Manufacturers and sellers select warranty terms, but consumers have little or no opportunity to engage in negotiations over those warranty terms and consumers often have few meaningful alternatives for other products or different contracts.[2] Though some producers provide warranties to instill confidence in particular products and as a selling point over competitors, many producers disclaim all warranties in the fine print of contracts that consumers never read. And while there may be information provided concerning certain risks when a warranty is marketed, those risks otherwise remain unidentified. That dynamic creates its own information asymmetry as producers may strategically select when to make risk information available or understandable to consumers and when to bury it in fine-print adhesion contracts. In the many situations where there is no back-and-forth between the parties, it is difficult to allocate risk in accordance with parties’ preferences. Albert Choi & George Triantis, The Effect of Bargaining Power on Contract Design, 98 Va. L. Rev. 1665, 1701 (2012).
Giddings & Lewis dealt with a more typically commercial transaction that involved active negotiation and a written contract between the parties. 348 S.W.3d at 734. In this case, the consumer had no interactions or contract with the producer. (R. 11, PageID 62) Although contractual privity is not always a requirement of the economic loss doctrine, Mt. Lebanon Personal Care, 276 F.3d at 852, this case exemplifies common features of consumer transactions — the unequal positions of the parties and the lack of opportunity to negotiate. These inherent distinctions support treating consumer transactions differently than commercial transactions. In cases like this where consumers have no contact with the producer, let alone negotiations or a written contract, Norcold’s argument that the freedom to contract will be infringed absent application of an economic loss rule is simply misplaced.
c) Encouraging Best-Situated Party to Insure Against Risk of Loss
The third policy — encouraging the party best situated to assess risk of economic loss to insure against it — also differs between the commercial and consumer con *334 texts. In commercial transactions, purchasers are typically sophisticated parties that are well informed about both the product and its intended use. In that context, the purchaser is usually well situated to assess the risk of economic loss because it knows how it will be using the product and what it expects of the product. Perhaps this is why the Supreme Court of Kentucky described the party best situated to assess the risk of economic loss as “usually the purchaser” when discussing a commercial transaction in Giddings & Lewis. 348 S.W.3d at 739 (quoting Mt. Lebanon, 276 F.3d at 848). Not only can commercial purchasers make an informed decision about how to properly insure the product, they usually have adequate insurance options available. In the consumer context, however, there is often a large information and capacity asymmetry between the seller who specializes in the field and the purchasing consumer who is necessarily a generalist. Although the consumer may best know what she wants to do with the product, the seller usually has substantially better information about what to expect of the product’s performance and what consequences might flow from that performance. Consumers are unlikely to understand the risks inherent in the product’s use and even if they did, they may not have insurance options available to insure against that risk.[3] In this context, the producer is probably in the better position to select proper liability insurance.
2. Other Indications from the Supreme Court of Kentucky
Despite the cases referenced and the policy arguments explicated above, Nor-cold argues that the Supreme Court of Kentucky would extend the economic loss rule to consumer transactions. First, it notes that footnote five in the Giddings & Lewis opinion directs the reader to the relevant section of the Restatement (Third) of Torts that does not distinguish between commercial and consumer transactions. Id. at 737 n.5. Though this dicta explicitly declines to rule on the matter, Nor cold argues it indicates that the court might treat the two contexts similarly. It also argues that Kentucky would extend the economic loss rule to consumer transactions because that it is the majority position among the states. See Frumer & Friedman, Products Liability § 13.07(4) (rev. ed. 2015) (listing fifteen states that apply the doctrine to consumer transactions and two states that explicitly do not). Norcold relies on the fact that the Supreme Court of Kentucky previously looked at sister courts to determine the appropriate scope of the economic loss rule. Giddings & Lewis, 348 S.W.3d at 739 (noting “a majority of our sister courts do not recognize the [calamitous event] exception,” but also disclaiming that “[o]ur position is not a matter of deference to the majority view or the nation’s highest court but rather a matter of logic”).
We draw a different conclusion. First, as explained above, two of the three policies espoused by the Supreme Court of Kentucky as underlying the economic loss rule justify treating commercial and consumer transactions differently. Kentucky’s highest court, moreover, has provided two signals supporting this conclusion. When the *335 Supreme Court of Kentucky announced the economic loss rule in Giddings & Lewis, it could have used broad language that would encompass consumer transactions. The court chose not to do so. Instead, its opinion regularly described the rule as applying to a “commercial purchaser,” 348 S.W.3d at 733, to a “product sold in a commercial transaction,” id. to a “manufacturer in a commercial relationship,” id. at 738, and to “commercial transactions.” Id. Likewise, the court could have disagreed with the Sixth Circuit’s assessment that Kentucky case law justified not extending the rule to consumer transactions, but instead cited the Sixth Circuit opinion with general approval. See id. at 739.
A second indication that the Supreme Court of Kentucky would not extend the economic loss rule to consumer actions is its general skepticism of .the rule. The rule was not announced in Kentucky until 2011, twenty-five years after the foundational case on the matter from the U.S. Supreme Court. See id. at 733 (citing East River Steamship, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)). At that point, Kentucky was joining “virtually all states” in recognizing the doctrine. See id. at 736. In an area of law where the Kentucky courts are generally skeptical, we are wary of expanding the scope of the rule based on unclear dicta in a single footnote, particularly in light of Kentucky’s other jurisprudence on the issue.
We conclude that the Supreme Court of Kentucky would not extend the economic loss rule to consumer transactions.
C. Applicability of Doctrine to Recalls
State Farm claims that even if the economic loss rule applies to consumer transactions, Norcold can be held liable for post-sale negligence by failing to conduct an effective recall. In light of our holding that the economic loss rule does not apply to consumer transactions, we do not decide whether the rule applies to recalls and claims for post-sale negligence.
D. Motion to Certify Questions to the Supreme Court of Kentucky
Norcold has moved to certify two questions to the Supreme Court of Kentucky: 1) whether the economic loss rule applies to consumer transactions; and 2) whether the rule extends to claims arising from product recall programs. Because we perceive adequate indications that the Supreme Court of Kentucky would not extend the economic loss rule to consumer transactions, we find it unnecessary to certify the questions.
CONCLUSION
Based on the jurisprudence on this issue in Kentucky and because the policies underlying the economic loss rule justify treating commercial and consumer transactions differently, we hold that the economic loss rule does not extend to consumer transactions. We therefore affirm the judgment of the district court. Norcold’s motion to certify questions to the Supreme Court of Kentucky is denied.

. The dissenting opinion warns of "contract law ... drownfing] in a sea of tort” if tort relief is available for purely economic losses. (Dissenting Op. 336) (quoting State Farm Mut. Auto. Ins. Co. v. Ford Motor Co., 225 Wis.2d 305, 592 N.W.2d 201, 209-10 (1999)). But the status quo in Kentucky is that the economic loss rule does not extend to consumer trans *333 actions. It is under this circumstance, which maintains both tort and contract areas of law, that insurers and purchasers have negotiated insurance contracts, including the one between Swerdloff and State Farm at issue in this case.

. Manufacturers and third parties do sometimes offer for purchase extended warranties on durable consumer products, though such policies themselves are opaque or unavailable for review.

. The dissenting opinion points out that Swerdloff was able to adequately insure his RV through State Farm. (Dissenting Op. 337) This is most likely a result of the circumstances in this case; the product in question— a refrigerator — was installed as a component part of a larger durable product — an RV — that was insured. Extending the economic loss rule to all consumer transactions sweeps up many circumstances involving everyday products and smaller durable products — including stand-alone refrigerators' — that are less likely to involve adequate insurance options for consumers.